UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION

UNITED STATES OF AMERICA        )
                                )
                                )
                                )
        vs.                     )        DOCKET NO. 3:25-cr-185
                                )
                                )
                                )
ARTURO ALBARRAS ALTUNAR,        )
                                )
                                )
    Defendant.                  )


TRANSCRIPT OF ELECTRONICALLY RECORDED
DETENTION HEARING
BEFORE THE HONORABLE DAVID KEESLER
UNITED STATES MAGISTRATE JUDGE
JULY 11, 2025


APPEARANCES:

On Behalf of the Government:

    Kenneth Smith
    United States Attorney's Office
    227 W. Trade Street, Suite No. 1650
    Charlotte, North Carolina  28202

On Behalf of the Defendant:

    John Baker
    Federal Public Defender's Office
    129 West Trade Street, Suite 300
    Charlotte, North Carolina  28202




    Deborah Cohen-Rojas, R.D.R., C.R.R., F.C.R.R.
                Official Court Reporter
    Deborah_CohenRojas@ncwd.uscourts.gov  704.350.7497
*Proceedings stenographically transcribed via digital recording.*

THE COURT: Okay. The first matter we'll take up this morning is Arturo Albarras Altunar. The number on this is 3:25-mj-176. We appreciate Ms. Vega being here to interpret for him. Mr. Baker is here for the defendant. Mr. Smith is here for the Government on this.

Mr. Smith, who you got there with you?

MR. SMITH: Your Honor, Special Agent Willie Carswell, who was with Homeland Security Investigations. He's the case agent.

THE COURT: Great. Thank you.

All right. The case is on the calendar for a preliminary hearing, if we need it, and a detention hearing, as well. I would mention, however, that, in this case and in the three that follow it, the defendants have filed motions to reconsider the Court's earlier decision regarding the Government's qualification for a detention hearing here.

We could do this any way you want. I mean, I'm inclined, Mr. Baker, to hear from you on your motion and then see where we are at that point. But let me check with Mr. Smith and see what -- what he thinks about that.

MR. SMITH: Well, your Honor, the -- first of all, it's the Government's position that we feel like the Court's prior rulings in the four cases were correct on the applicable standard. We also believe that this -- if we get to it, is a motion we consider seeking a second bite at the apple, as it

argued before.

Also, your Honor -- and the Court appears inclined to hear the defense motion. We would ask that the Government be allowed time for more fulsome response. The -- we got in all four defendant cases yesterday, and I think we get until, I believe, the 17th to fully respond. So of course we'll argue what we need to argue today, but we would like an opportunity to respond with legal authorities if need be.

THE COURT: Okay. Well, I'll take that request under advisement and return to it. I'm inclined to hear from Mr. Baker on his motion, so we'll do that first, and we'll see where we end up at that point. Mr. Baker.

MR. BAKER: Thank you, your Honor. You know, as we wrote, plus as Ms. Gerber talked to the Court last -- on Tuesday, as we wrote in Document No. 7, what we requested on Tuesday was frankly what Mr. Smith just asked for, time to adequately represent our clients. And I do want to set the stage a little bit for the Court.

And before I even kind of set the stage factually, before we even talk about the law, Tuesday we had eight detention hearings.

THE COURT: Eight what?

MR. BAKER: Or I'm sorry. Eight initial appearances.

THE COURT: Right.

MR. BAKER: Ms. Gerber was on duty. Ms. Gerber had a

hearing also in the afternoon. And we were able to bring a couple of other lawyers in to help Ms. Gerber out, prepare for the hearings, also required bringing in interpreters in order to adequately represent our clients at the initial appearance.

The initial appearance, as the Court knows, is different than a detention hearing. There's a decision that is made at an initial appearance whether a detention hearing is necessary. What Ms. Gerber was asking for was time to address that initial question.

You know, I happened to be in the back of the courtroom, and I heard the Court kind of question -- you know, essentially there was probably a better way to do this. Very candidly, your Honor, the week before, in front of Judge Rodriguez, the same request was made, and it was granted, no question.

As the Court knows, this district has a detention issue. We have people scattered all over the place. The Marshals have an impossible job. On a duty day, we have no idea when our clients are going to arrive. Fortunately on Tuesday, in all candor, the Marshals -- I think there were 24 criminal hearings in this building, and they got everybody there all the time. But Ms. Goodnight had to get through eight.

And what we wanted to do on Tuesday was kind of break off the cases where there was going to be potentially a detention hearing and address the issue whether there needed to be a detention hearing, and in the cases where there wasn't going to

be, you know, just kind of go on with the day. That's kind of what happened in -- and we're here today to just deal with that detention matter.

But legally, the distinction matters. It's an incredibly important distinction under the Bail Reform Act. There's -- I describe the Bail Reform Act as a gate system. Gate 1, do we go to detention hearing? We don't go through Gate 2 -- we don't go through Gate 1 to get to Gate 2 until Gate 1 is met.

And what we wanted was time to prepare to allow you the information you needed to make a decision. Since Tuesday, my team's had an opportunity to meet with our client's family, found out important information. We have been able -- Mr. Smith has provided some discovery.

And to allow us time to be prepared today to address the Gate 1 issue -- and I'll proffer to the Court, I am confident that you're not going to go past Gate 1 today. You shouldn't, not with these facts and this record. But even if you did go past Gate 1 -- which is you have to make a decision, is this man a serious risk of flight? If we go through Gate 1, then we have a detention hearing at Gate 2.

And, you know, this is an unusual -- this is -- this is just an unusual set of facts. It's an unusual set of facts for a couple of reasons. One, the volume, the volume coupled with all the other cases that were going on. Two -- you know, let's be -- let's be open and honest about what's going on.

Immigration cases are back. This is the first time for my office we've had a big set.

I have an obligation to this client and every other client to make sure that our clients are adequately prepared. I take that obligation so seriously that Friday we flew in three AFPDs from other districts to train us on immigration cases because they just -- we just, for the last four years, did not have them. We've had a few. Mr. Smith's handled most of 'em. He's been great to work with, but this is new and important.

And then you put -- and then you put on top of that the fact that -- and I'm only talking about the facts of this case. This is their proffer: In 2016, he had interactions with law enforcement -- or either with law enforcement or immigration, wasn't charged criminally but was removed. If you read the complaint, he was cooperative.

In 2025, he's arrested. There's talk about paperwork Mr. Smith provided last night, an I-9 form from 2021. We got a PSR from probation that identified zero criminal history, nothing.

So what we wanted for these detention -- these four cases was to adequately prepare because Mr. Altunar deserves all the rights and representations that all my other clients get. If this wasn't -- you know, the -- the -- the tricky part of this case or the hard part of this case or the more -- the most criminality part of this case seems to be the false

documentation. So I'm not going to concede it's correct, but that's the false documentation. All of our other cases that involve -- basically, cases like this, there's not even a detention hearing. We all agree to bond before.

The tricky thing -- the thing here is he's here illegally, but that's why we wanted time. And I know -- you know, your Honor, I know we didn't talk to the Court about this before. We've had time to talk to the Court about this before. I know this is the way things happened -- you mentioned in Court the other day, you know, we've been doing business for 20 years this way. Well, I'm sorry. My job and my office's job is to, at times, uproot 20 years of practice.

And on the immigration cases in particular, Peter Adolf has been fighting this issue before he left the office. He's been fighting this issue for a couple of years and, frankly, changed the practice, changed the practice because the way the detention hearings used to be -- it would be, I want a detention hearing, you get a detention hearing.

There's a little change to the -- there's a little change to the guide. I want a detention hearing because -- state your basis -- then we go to the detention hearing. That small change is huge. That's Gate 1, and that's what we wanted. And we're not going to do this all the time. But sometimes we need it, and Tuesday we needed it.

So it was my request that we start -- and -- that we start

at -- that we basically start at Gate 1. And it's ironic that Mr. Smith asked for time to be prepared for Gate 1 when he walked in Tuesday to be prepared for Gate 1 on a case -- and I know this came in in a complaint, and there's a lot going on and whatever. But -- anyway.

So what my request today is that you reconsider your decision to make a ruling on the Gate 1 decision to allow me an opportunity to respond to their -- you know, to their proffer on Tuesday. So that's what I would like to do.

THE COURT: Okay. Mr. Smith, you want to say anything?

MR. SMITH: Yes, your Honor. To be clear, in terms of talking about behind the curtain, I think the public defender's office -- we filed these criminal complaints last Thursday. I had a conversation with someone from the assistant federal defender's office, so they were aware since last Thursday about this. I even spoke with their -- I got emails -- multiple emails from their person who handles conflict.

So the public defender's office has been aware since July 3rd this case was coming. So there was at least four to five days before Tuesday, in terms of preparation, that they have known or should have been aware that these were coming. And so I do think that -- in terms of prep time, I think we were operating under the same time constriction or at least awareness of the criminal complaints.

Regarding, I guess -- and again, I think it is the Government's position -- and we stand by what we argued on Tuesday, and the Government's still -- it's our position that was sufficient, not only what we stated -- and I would just like to note briefly, there has been -- I think typically, as it relates to procedural history of the filing of the federal defender's Office, some of the things that the Government argued were left out.

And I think, as the Court at this stage in terms of -- as Mr. Baker noted, Gate 1 -- and what I also note, just neither here nor there in terms of history, it was actually David Brown who opened this issue as it relates to serious risk of flight, not Mr. Adolf, who was the first one who changed the practice. But nevertheless, there's a reason why we have 20-plus years of practice.

And it does appear at this point in time that there has to be a good reason, number one, Congress can do it. But nevertheless, if you're going to change the law, if you're going to change the rules, if you're going to change the practice, I don't think this is the way or the situation to do it.

But more importantly, your Honor -- and again, just within the four squares of what the Government argued the other day, it is the Government's position that alienage and immigration status do, in fact, matter. I think Mr. Baker noted that the

defendant has had some prior contact with immigration authorities, the significance of that being he didn't listen to them, he did not follow immigration law, and he was noncompliant.

So it's the Government's position -- just as he was noncompliant twice as it relates to staying out of the country, it is the Government's position, with a court order to release him, that would happen again. So those are essentially, your Honor, the arguments that the Government raised on Tuesday, and we believe that they're still sufficient to -- for the position that the defendant remains.

And again, the issue isn't whether he's going to flee or there's a serious risk he will flee, but whether or not there is the existence of such a risk. And we believe that such a risk still exists. Thank you.

THE COURT: All right. I'll come back to you.

Mr. Baker, let me hear your argument as to why there is not a basis for a detention hearing in Mr. Altunar's case. I've read your motion, by the way --

MR. BAKER: Thank you.

THE COURT: -- and the other three, the last two of which arrived at eight o'clock last night. But thank you very much for your work.

MR. BAKER: So the Government's proffer is that anybody who illegally enters the United States and comes back

should be detained. That's it.

Now -- okay. So the -- they have alleged -- and they alleged on Tuesday so -- you know, we're looking at that he provided false documentation in order to work and stay in the United States. Not leave, not flee. You know, it's interesting that the proof that he's going to -- the proffer that he's going to flee that they provided to you is that what he was -- what they proffered is he was coming back into the jurisdiction.

Gate 1 requires a serious risk of flight. There's not even a failure to appear at a traffic court before you right now. There wasn't on Tuesday. If you read the complaint, he was cooperative with law enforcement or immigration enforcement or whoever it was in 2016.

We have subsequently found out, since Tuesday, that the false paperwork that they are relying upon occurred in 2021, where since then he has been working in the district, in the United States.

So if -- you know, your Honor, he represents his side, I obviously represent Mr. Altunar, and you stand in the middle. And I had the privilege a couple of weeks ago to go to the Fourth Circuit judicial conference, saw you there, when Chief Judge Diaz spoke.

And he began his speech by reading the oath of office for federal judges and asserted to me as a reminder of the

important role you play in processes like this, where the law -- where you must apply the law. And you have to make a finding that their proffer demonstrates a serious risk of flight. And I just -- there's -- there's no -- there's -- they haven't even shown a risk of flight, let alone a serious risk of flight.

And, your Honor, you have -- I don't mean to make you sound old, but you have decades of experience. Think about the records you've seen where people -- you know, there's something to show that this person isn't going to show up. There's nothing to show that this man will not show up at court, there's just not, and their proffer is absent it.

So it's our position that we should not be holding a detention hearing at all because they've not met their burden on Gate 1. There is no proof of serious risk of flight.

THE COURT: All right. Mr. Smith, I guess we went down this road on Tuesday, but let's do it again.

MR. BAKER: Yes, sir.

THE COURT: What is the Government's argument that -- under 3142(f)(2), there's a serious risk of flight here that would entitle the Government to a detention hearing?

MR. SMITH: Your Honor, the Government's position quite frankly is that, if the Court were to release this defendant, there is a risk of flight.

As we talk about real-world realities, if Mr. Altunar is

released, he will be deported back to Mexico. And real-world reality is unlike the -- back in 2016, when he was able to come back twice within a month -- I think that reality no longer exists.

So it is the Government's position that, if the Court were to release him, he would make efforts, not abide by the law, and return to -- attempt to return to the United States. So that's one, your Honor.

Also, it's noted the defendant's I-9 for employment has used both a fake driver's license and a fake Social Security card. And we believe that, if he were -- if these -- the access to or use of fraudulent documents -- and there's some case law supporting it -- could aid his flight and avoidance if he were not to return to court.

And as we just previously stated, alienage and immigration status, as well as the lodging of an immigration detainer, although not presumptive, nevertheless are factors regarding the defendant's -- a serious risk of flight if the Court were to release him.

So those, your Honor, are in essence the -- that's the Government's position, that, if he were to be released, there is a -- there are incentives for him -- one, both the punishment, the removal to -- I believe it's Mexico -- there are many factors that create a risk -- not to say he's going to do it, but there is a risk that, if the Court were to release

him, this defendant would not show up as he should.

And we do believe that the Government has satisfied its burden, which is by a preponderance of the evidence, that a serious risk of flight exists in this case.

THE COURT: Let me ask you a couple things, Mr. Smith, just to tease some of this out.

MR. SMITH: Yes, sir.

THE COURT: There's case law out there, I think -- we've spent a lot of time over the last three days looking at some of this. And my staff is a lot smarter than I am, thank goodness, but there seems to be case law out there that suggests that serious risk of flight is a volitional thing. It's not -- you don't back into that.

It's -- it's different, you think, to say that someone poses a serious risk of flight than it is to say that there's a significant risk of nonappearance. There's an intentionality to flight, if you will. So this whole idea that, if I release the defendant, he might be picked up by ICE and, therefore, might not show up for court, I mean, it's relevant, I suppose, at some level or interesting to talk about, but it's not a volitional risk. It's not something that the defendant himself does. What do you think about that?

MR. SMITH: And to be clear, your Honor, the -- I -- that is a possibility, that he will be picked up by ICE. But the Government's position is this defendant, if the Court were

to release him, there's a risk that he would get another fake ID, fake driver's license, become a different person, and would not -- and would not come to court because he -- your Honor, we also think there's a risk because, again, he was told to stay out of the country, did not stay out the country.

So there is an element with noncompliance and with rules, and we do believe there's incentive for him to perhaps, like I said, get documents. So it's not just a matter of we're worried about ICE picking him up, which is a factor. We're worried about the defendant wanting to stay in the country, and he has the means to stay in the country by becoming another person with IDs, et cetera, et cetera. So that's a risk.

THE COURT: Okay. I'm only asking these questions because I know that they are -- they've probed the -- if I do say so, the weaker points of the Government's arguments. So let me ask you another one.

That's also been observations in cases, that, well, as odd as it may seem to say out loud, when somebody comes back to the country after having previously been deported, they're coming back here because they want to be here, as opposed to there.

So it strikes me that there's an argument that that cuts both ways, that it's arguably a criminal disregard of the Government's order to leave the country, and yet, at the same time, some indicia that they actually want to be here with their family and not there. What do you make of that?

MR. SMITH: Your Honor, but the bottom line is he has no status to enter or reside in the United States. And that's just where we are. He's an alien. He can't be here. He's not supposed to be here. Your Honor, he's not supposed to work here.

So we have almost normalized illegalities, and that's just the bottom line. Last summer my wife and I, we were in France. I thought Nice was a very nice and good place, enjoyed the food --

THE COURT: Very nice place, yeah.

MR. SMITH: -- but I can't stay there because I'm not a French citizen. I had to come back here.

And so the same analogy as he sits here -- and he is getting the benefits. No doubt about it, Judge. We're going back and forth. This is a great place. As Judge Cogburn says all the time, if you were born here, you hit the birth lottery. And so that's a reason why a lot of people want to be here.

But as he stands -- as he sits here today, your Honor, he's in this country illegally, and so he doesn't get -- well, I want to come back. He can't come back. He's not supposed to be here. He's not supposed to work here. And I think we have to factor that, as well, what he's wanting to do, and the reasons are illegal.

THE COURT: Now, isn't -- look, you and I have known each other a long time. I like you a lot, and you're very good

at your job. Isn't that tantamount to saying that the Government's going to urge the Court to find that there's a serious risk of flight in every single illegal-reentry case?

MR. SMITH: That's not -- your Honor, as the Court may be aware, I think both in your court, as well as, I think, Judge Rodriguez, there have been individuals who have been released and then we've made the call with our agent or office to decide, are we going to keep them going? But sometimes we just dismiss those cases.

As the Court is aware, a few -- a month or so ago, there was an individual who had terminal cancer, and the Government made the call that, well, you know, given his circumstances, we're not going to pursue that. We're going to lift the detainer so he can live his last days here with his family.

So your Honor, there is a sense -- no doubt about it -- of trying to be fair to defendants and their families. But nevertheless, as Mr. Baker said, I have a job to do, he has a job to do, just like you have a job to do. And mine is to enforce the immigration laws of the United States.

THE COURT: Isn't the best part of your argument that there's a serious risk of flight goes to your -- the false documents?

MR. SMITH: Your Honor, I think two parts. I think it is the false documents, access to documents. I think, again, illegal status, illegal residing here. But also not supposed

to work, and yet he got documents so he could work. So, yes, that is part of it, but also, I think, just general noncompliance.

THE COURT: Are you able to be more specific about what the documents were in 2021 or whenever that was? What -- what were the documents and what do you argue that suggests?

MR. SMITH: Your Honor, if I may -- and I passed a copy to Mr. Baker. If I may pass -- approach and pass documents to the Court, that is the I-9, which, as you know, is an employment authorization. And this is, again, part of the Buckeye Fire Equipment case.

The defendant is using the -- an alias, Angel Grenados, [phonetic] and used a -- there's a -- I don't know about the veracity -- or the truth of the address, but I believe page 3 of the defendant's -- of the document handed up, your Honor, we have a Social Security card, name of Angel Grenados, and then we have a Social Security number there, but also a driver's license.

So it's the Government's contention that he, at least then, had access to these documents, and either he or other persons produced these fake documents. So it's the Government's contention -- what stops him, if you were to release him, from doing the same thing?

THE COURT: Okay. Give me a second here. Mr. Baker, I'm going to come back to you. I just need to make a note

here.

MR. BAKER: Sure.

THE COURT: Okay. So, Mr. Baker, I don't want to under-appreciate what Mr. Smith is saying, but I think he's proposing at least three things here: That the defendant illegally returned after having previously been deported in -- contrary to -- did that contrary to Government order, he possessed and used a false North Carolina driver's license and a false Social Security card in 2021 and following, and there's an ICE detainer in place for him at this time, which of course, standing alone, would not be sufficient under some cases that we've also looked at. But those three things at least, perhaps more, have been proposed. Why is that not sufficient to form the basis for a hearing?

MR. BAKER: Your Honor, the -- Mr. Smith's argument really is a danger-to-the-community argument wrapped up in a serious-risk-of-flight argument because what he's saying is he's going to break the law. He broke the law before, he's going to break the law. There's not the -- that's not the inquiry. The inquiry is, is he a serious risk of flight?

So he proffered that, in 2016 -- and you know, it's written in the complaint, that Mr. Albarras tried -- came back to the United States. And it's -- the question you asked him is -- that's the meat of the issue. So it isn't like he left and never came back and we had to send somebody to extradite

him. He came back.

The possession of the false documents in 2021 and following -- and I'm going to accept the premise that there was any following, but in the 2021 document that Mr. Smith handed up, why did you -- to the extent -- and I understand that it's certainly relevant, but what were they used for? To get a job, to stay here. His family resides where he goes to church, where his kids get medical treatment. So that doesn't demonstrate a serious risk of flight. That demonstrates somebody who wants to stay.

And the ICE detainer, even the law is pretty clear on this, your Honor. It's not pretty clear, it's clear, it's crystal clear. And the -- Mr. Smith's other argument, that I guess, if we let him go today and we ignore that ICE may keep him and he goes out on the street, he's going to somehow escape -- I mean, where -- he's going to buy -- we don't -- what we know about his obtaining of these documents is evidence Mr. Smith provided the other night -- or our client -- or there was a conversation with our client and law enforcement about it. But it was -- there's just no evidence that he's going to go out and do it again, particularly when somebody -- there's an absence of criminal history. I mean, there just is.

Your Honor, I -- I suspect that there is a very, very, very, very, very small percentage of cases you've seen where there's no criminal history. And then you put on top of that

the statistics about failures to appear in immigration cases we've provided to you. If there's a class of client who comes to court, who's not a serious risk of flight, it's this class of client.

So I -- you know, I'm -- I don't think we've gone through -- as I told you when we started, we shouldn't be walking through Gate 1 yet because Gate 1 should never open. The proffer is just not there because, if the proffer's there, every single immigration case -- it's arrest, detention hearing. That's not what the law says, that's not what the law requires, that's not what the Bail Reform Act says.

So, you know, I'd just ask that you follow the law. We are not -- this is -- he wants -- you know, the Government's position is they want the -- they really want any immigration client to be treated as a presumption case. That's not what the law is. They have to prove serious risk of flight. So I just don't think that we're there. Thank you.

THE COURT: Well, there is case law that says false documents, fraudulent documents, that's relevant to --

MR. BAKER: It certainly is. I don't disagree with that. But again, look at the date and, you know, look at -- and, you know, it's our position we shouldn't be past -- we shouldn't be past Gate 1. If we have a discussion on Gate 2, I can explain a little bit more, you know, why he shouldn't be detained. But that's all -- and that is it.

2021, we have a form that I will note is completely in English, completely. There's a computer signature where that was -- for the person that filled out the form. It's about the middle of the page. It said that this -- right below the signature, this was not done using a translator for somebody who doesn't speak -- read -- doesn't speak, read, or understand English. So I just -- you know, I don't want to belabor the point, but I don't think we're past Gate 1.

THE COURT: All right. Mr. Smith, this is a detail, but I'm just curious. We have another case pending at the moment we took under advisement, but it's a case in which the Government charged two different offenses regarding false documents. Why did the Government not do that here?

MR. SMITH: Your Honor, to be quite frank, I think the investigation is ongoing. I think they're still going through the paperwork.

For example -- and I was just speaking with the case agent. To do false documents -- or at least -- for example, you're going to do an aggravated identity-theft case. Well, that entails contacting Social Security. Is this a real number? Is this number tied to a real person? So there's some other steps to get to that point, whereas it was a little easier and quicker, quite frankly, to pursue at this point, you know, an illegal reentry charge so --

THE COURT: All right. So, Mr. Baker, am I reading

the Bail Reform Act correctly to say that, if I were to find that there's not a sufficient showing of a serious risk of flight, then the Court would set a bond for the defendant?

MR. BAKER: That's correct.

THE COURT: Well, let me be practical here. I'm inclined to set a bond for the defendant. So do you wish to be heard any further on this first question?

MR. BAKER: No.

THE COURT: Okay. Let's talk about bond, then. And I'm not trying to be tricky here. I just wanted to sort of signal where I think this is going. Would you like to tell me anything else about the defendant that I can take into account?

MR. BAKER: Yes, sir. So I provided Mr. Smith, and I will hand up to the Court, just a couple more photos.

THE COURT: Okay. Thank you.

MR. BAKER: So Mr. Altunar is a father of three and a grandfather. He's been married to his wife for 22 years. He has roots in this community, resides in the district. I'll be more than willing to share with probation his address. I don't want to do that in open court. He has no, zero, criminal record. His two school-aged children are enrolled in schools in this district.

The reason why I handed you the picture -- it's pretty hard to see, and I apologize for that. The reason why I handed you the picture of his youngest son -- his youngest son has a

medical condition, receiving treatment for it. He's happy with the medical treatment that has been provided, but his son does have some breathing problems. And he put -- Mr. Altunar plays a pretty important role in his son's treatment.

Just to give the Court an idea of the sort of responsible person Mr. Altunar is, again, no criminal history, no interaction with law enforcement. He has a church he goes to in town. His oldest daughter is pregnant, was able to bring a grandchild into the house. He provides for his family. And bond would be appropriate in this case.

THE COURT: All right. Thank you.

Mr. Smith --

MR. SMITH: Sir.

THE COURT: -- you want to say anything about bond if I get there?

MR. SMITH: Your Honor, we do have at this point -- and I can speak with the case agent about what practically would happen, I think. And there's a detainer lodged against him. And then we have to have a conversation about what that means and what that looks like, what agencies we may have to notify and make some practical decisions --

THE COURT: Right.

MR. SMITH: -- so I think we would ask, at least, some sort of monitoring so we can know where he is.

And so I think that's, at a minimum, what we would ask,

and then I'll do more on the other administrative side as it relates to immigration. I'll sort that out with the case agent. We would at least ask location monitoring so we know where he is.

THE COURT: Okay. Thank you.

Mr. Baker, I was thinking about some sort of monitoring. So do you wish to respond to that before I take some action on this?

MR. BAKER: No.

THE COURT: Okay.

MR. BAKER: If monitoring makes the Court feel comfortable, then we're good with that.

THE COURT: Okay. All right. Well, just to be clear, here's what's happening. And perhaps this will be slightly frustrating to some, but the ruling essentially is going to be this. Happy to hear from the parties on the question of Gate 1, as Mr. Baker refers to it, the question of whether there's an adequate showing of a serious risk of flight to have a detention hearing. I think that's a close call.

I'm going to ask that the parties engage with me in a process here of assuming for the moment that I were to find that a detention hearing was appropriate. The Court finds, based on the record here, that a bond is appropriate here. So I will ask the clerk to prepare bond papers for him, $25,000 unsecured bond, usual conditions.

This may sound a little odd, but I'll ask that we check the box regarding returning any passport he currently has and not obtaining a new one. I suspect that's irrelevant. Also, I'll ask that we check the box regarding warrantless searches. I think the usual travel restriction within the Western Direct of North Carolina should suffice, although does he live in the district?

MR. BAKER: Yes.

THE COURT: Okay. Madam Clerk, I'll also order that the defendant be on home detention with location monitoring. Mr. Baker's going to provide --

MR. BAKER: I'm sorry. I was --

THE COURT: Go ahead.

MR. BAKER: I was conferring with Ms. Goodnight, and I missed your question.

THE COURT: No question.

MR. BAKER: Okay. Sorry.

THE COURT: Thank you. Home detention with location monitoring. Mr. Baker is going to provide the probation office with the defendant's residence address. You know, I can imagine there's going to be a few -- a little hammering over the language of some of these conditions. He's required to work under the normal language. Anybody have a concern about that?

MR. SMITH: Well, your Honor, it's illegal for him to

work in the United States. I know that's a tough situation, but I -- I don't want to agree to something when it's not authorized.

THE COURT: Mr. Baker, do you have anything to say about that?

MR. BAKER: I would think that would be -- this is a situation where I think we should remove that requirement. I don't think the Court can say please violate the law.

THE COURT: Right. Okay. Madam Clerk, are you able to uncheck that box?

THE CLERK: Yes, sir.

THE COURT: Okay. I think that's best simply because it's inviting mischief. I mean, it just is weird, so we won't do that.

Okay. Release will be upon probation's investigation of the residence and as soon as location monitoring has been established. I'm going to try to move on that as quickly as we can.

All right. Anything else on this, Mr. Smith?

MR. SMITH: I don't believe so, your Honor. Not at this time from the United States.

THE COURT: Mr. Baker?

MR. BAKER: No, sir.

THE COURT: Okay. And I recognize this is maybe too cute by half, but I'm not issuing a ruling on whether the

Government satisfied its burden under (f)(2) to show a serious risk of flight. I'm just simply being practical and finding that, assuming the Government were able to meet that burden, this is an appropriate case for bond, and I'm setting a bond.

MR. BAKER: Thank you, your Honor.

THE COURT: All right. That's what we're doing. Madam Clerk, whenever you're ready.

(Discussion off the record.)

THE COURT: Okay. Bond conditions are next.

(Discussion off the record.)

THE COURT: Okay. The bond papers have been executed by Mr. Altunar. We'll make those a part of the record in the case. I guess technically he does have a right to a preliminary hearing. Would he waive that?

MR. BAKER: Yes.

THE COURT: All right. Madam Clerk, would you put the usual waiver form out there for us?

(Discussion off the record.)

THE COURT: Okay. Okay. The standard waiver form regarding preliminary waiver has been signed both by the defendant and Mr. Altunar and also by his counsel, Mr. Baker. We'll make that part of the file, as well.

Anything else for him today, Mr. Smith?

MR. SMITH: No, your Honor, not at this time.

THE COURT: Mr. Baker?

MR. BAKER: No, sir.

THE COURT: All right. Sir, good luck. Thank you.

(End of recording)

C E R T I F I C A T E

I, DEBORAH COHEN-ROJAS, Federal Official Court Reporter for the United States District Court for the Western District of North Carolina, a Registered Diplomate Reporter, Certified Realtime Reporter, and Federal Certified Realtime Reporter, do hereby certify that the foregoing transcript is a true and correct transcript of the digitally-recorded proceedings transcribed under my direction.

Dated this 27th day of October, 2025.

_____
DEBORAH COHEN-ROJAS
RDR, CRR, FCRR
Federal Official Court Reporter